CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 01 2013

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Roanoke Division

MARGARET A. ANDREWS,　　　　)　　CASE NO. 7:11CV00037
　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　)　　__MEMORANDUM OPINION__
vs.　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　)
STAPLES THE OFFICE SUPERSTORE )
EAST, INC.,　　　　　　　　　)　　By: James C. Turk
　　　　　　　　　　　　　　　)　　Senior United States District Judge
　　　　Defendant.　　　　　　)

Plaintiff Margaret Ann Andrews ("Andrews") filed this action against her former employer, Defendant Staples the Office Superstore East, Inc. ("Staples"), asserting a number of employment-related claims, to wit: (1) a hostile work environment claim under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, based on her sex, arising from the conduct of a male co-worker that she claims was not remedied after she complained about it;[1] (2) a hostile work environment claim based on her religion, Christianity, arising from an incident in which someone ripped out a page from her Bible and took the Bible, and another in which someone cut the cord to the radio on which she sometimes listened to Christian music; (3) a claim for intentional infliction of emotional distress under Virginia law; and (4) a claim that Staples retaliated against her when she reported the alleged harassment by reducing her work hours, in violation of Title VII.

Pending before the Court is Defendant Staples's motion for summary judgment. ECF No. 16. Staples contends that it is entitled to judgment as a matter of law as to all of Andrews's

---

[1] As discussed in more detail herein, the conduct by the male co-worker, Jacob Elias, included repeated incidents where he changed into his work uniform in the break room of the store in front of her and other employees as well as other behavior directed toward her that Andrews found threatening or harassing. See infra at 4-8.

claims. In particular, it argues that neither the instances of co-worker Jacob Elias changing clothes in her presence nor other behavior by Elias was harassment of Andrews because of her gender, and that any such conduct was not sufficiently severe or pervasive to state a claim under Title VII. Staples further contends that, once Andrews reported the harassment, the company took prompt remedial action and the offending behavior did not recur. As to Andrews's religion-based hostile environment claim, Staples argues that it was neither severe nor pervasive and again contends it investigated after Andrews complained and the conduct did not re-occur.

As to Andrews's claim for intentional infliction of emotional distress, Staples argues that she has failed to establish at least two of the elements of such a claim. First, she has failed to present clear and convincing evidence of extreme or outrageous conduct. Second, she cannot show that Staples is vicariously liable for the alleged conduct.

With regard to her retaliation claim, Staples posits that Andrew's schedule was reduced because of her own request not to work in certain areas and being available to serve as back-up in those areas was required of everyone for certain hours of the day. Thus, it contends she has failed to show any causal link between her complaints and the change in her assigned work hours.[2]

Andrews has filed a response to the motion for summary judgment, ECF No. 21, and the Defendant has filed a reply. ECF No. 22. The Court heard oral argument on June 18, 2013, and the matter is now ripe for disposition. For the reasons discussed herein, Defendant's Motion for Summary Judgment, ECF No. 16, is **GRANTED**.

---

[2] Staples also argues that Plaintiff's claim for punitive damages should be dismissed as a matter of law because she has not met the Virginia tort law standards for obtaining such damages. In light of its other rulings herein, the issue of punitive damages is rendered moot and therefore the Court does not address it.

# I. FACTUAL BACKGROUND[3]

## A. General

Andrews, who is a female and a devout Christian, was hired by Staples in November 2000. As of 2009, she was working at Staples' Tanglewood location as an associate in receiving. Her duties included processing damaged returns, returning vendor and corporate returns, handling various aspects of Staples's recycling program, and handling disposals and donations. ECF No. 18, Ex. 1, Andrews Dep. (hereinafter "Andrews Dep.") at 24-25. The facts underlying the claims here all arose after Jacob Elias, a co-worker, was hired by Staples in approximately April 2009 as an electronics associate. During the relevant time, the management team at the Tanglewood location included: Tab Howard, the Store Manager; Jeff Dean, the Sales Manager; and Tony Pilcher, the Operation Manager. Tracey Williams, to whom Plaintiff complained about different incidents, was a regional Human Resources Manager for an area that included the Tanglewood location. Elias and the three store managers are males and Williams is a female.

---

[3] In her response to Staples's motion for summary judgment, Andrews has submitted an affidavit under oath and has also attached as exhibits a prior statement to the EEOC and a "supplement" to her claim of discrimination signed on June 22, 2010. See ECF No. 21, Ex. D, Andrews Aff. ¶ 1, referencing Exhibits A & B. Although the two statements are themselves unsworn, she "affirm[s] them] under oath" in her affidavit, thereby converting them into sworn statements. See id.

Staples argues in its Reply, however, that the Court may not consider either of her later filed statements because they conflict with her deposition testimony. ECF No. 22, at 3-4 & n.2. It is generally the rule that "a party who has been examined at length on deposition" cannot "raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony." Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984). Some of the averments in Andrews's later-filed statements clearly contradict her deposition testimony, and in key respects. For example, as discussed in more detail in addressing her hostile work environment claim based on religion, it is clear that she raises in her additional statements new allegations of harassing acts, and she had flatly denied in her deposition that there were other acts that supported her religious discrimination claim. See infra at 21-23. Some of the details in her additional statements, however, do not appear to directly contradict what she said at deposition insofar as her claim based on sex, but rather provide additional detail, clarification, or elaboration. Because the Court would rule in Defendant's favor on the hostile work environment claim based on sex even if it considers as admissible evidence the additional statements and affidavit from Andrews, it will consider the later-submitted statements for purposes of that claim.

**B. Allegations of Harassment Based on Sex**

Plaintiff's hostile work environment based on her sex is premised almost entirely on conduct by Elias. In June 2009, Andrews saw Elias change into his Staples uniform in the store break room for the first time. According to her, he took off his street clothes, down to his boxer shorts, and put on his Staples uniform. Andrews Dep. 32, 33, 34, 50. Amanda Wright was also present in the break room at that time.[4] Plaintiff said that she asked Elias what he was doing and that he responded he was changing his clothes. Andrews then told him, "[Y]ou can't do that in here, you need to go to the restroom and change," to which he responded, "[N]o, I'm not going in there, it's too dirty." Id. at 34. She said again, "Well you can't do that in here" and "[h]e just laughed." Id.

Andrews testified that she complained afterward to Howard, to which Howard allegedly responded, "It's no big deal. He's even done it in front of me." Id. at 35-36, 38-39. Defendant's summary judgment motion suggests that there were only two more clothes-changing incidents referenced by Andrews in her deposition—one in June or July and then one more in October. See generally ECF No. 18 at 1, 7-9. According to the statements submitted as part of her opposition to the summary judgment motion, however, Andrews avers that "[c]ontrary to the statements in defendant's [supporting memorandum], there were a lot more incidents of Jacob Elias changing his clothes than the three discussed. I do not remember all of the pants changing incidents, but I can vividly recall at least four at the end of June and two in July and the one on October 1, 2009." ECF No. 21, Ex. D, Andrews Aff. ¶ 2. She avers that she complained to Howard "[a]fter the second time," and that he "only told Elias he could change in the manager's office," but that

---

[4] Amanda Wright was a department supervisor of the electronics department at the Tanglewood Staples, but did not supervise employees. ECF No. 21, Ex. C, Wright Aff. ¶ 2. She worked at Staples from April 2003 until November 2005 and from November 2006 until September 2009 and has provided an affidavit in support of Andrews's claims. See id.

"Elias continued to change in the break room." Id.; see also Dean Aff. ¶ 3 (explaining that, in response to Andrews's complaint, the store management team counseled Elias not to change in the break room and made another space available to him for changing, the manager's room); ECF No. 21, Ex. C, Wright Aff. ¶ 5 (explaining same). According to Andrews, however, the manager's room where Elias was permitted to change had a glass window in it. On approximately three occasions, she walked up to the door and could see Elias in his boxer shorts through the window. ECF No. 21, Ex. B at 3; Ex. A at 2.

Starting in early July, there was a period of months where Andrews did not see Elias at all, and did not observe him changing clothes. ECF No. 21, Ex. A at 2; Ex. B at 3. Then, at some point the manager's room was "converted into a tech room to fix computers, and the [male] employee working there . . . yelled at Elias and told him he could not change there and should change in the bathroom." ECF No. 21, Ex. C, Wright Aff. ¶ 5. At that point, which was likely in late September or early October, Elias apparently began changing in the break room again.

The only (and last) time Andrews observed Elias changing clothes in the break room was on October 1, 2009. On that date, Andrews was leaving work and was heading to the lounge as another employee, James Channell, was standing between the hall and the break room. Channell looked at her as she was heading into the lounge and said, "Oh, good, you're just in time for the pants show." Andrews Dep. 37-38. As Andrews walked to the refrigerator, she turned around and said "What?" and then saw Jacob taking his clothes off. According to Andrews, both Channell and Elias started laughing and she ran out of the lounge crying. She apparently left the store immediately, without telling a manager what had happened, and was so "upset" that she "had to go straight to the doctors." Id. at 40. She also made her first report about this behavior to Staples' Human Resources department that day, previously having complained only to store

management.

She also told her husband what had happened. Mr. Andrews was upset and went to the store to talk with Elias soon after Andrews had left to go to the doctor's office. At some point during his visit, either Mr. Andrews or the store manager called the police. According to Dean, Mr. Andrews arrived at the store and wanted to speak with Elias, and also informed Dean that he would be calling the Roanoke County Police about possible charges (whether indecent exposure or sexual harassment). See ECF No. 18, Ex. A to Ex. 2, Dean Statement. The police were called, although there is a dispute over whether Dean called them, as a safeguard, or whether Mr. Andrews did. The police interviewed both Mr. Andrews and Elias and no charges were ever brought against anyone as a result of the incident. See id.

With regard to all of the clothes-changing incidents, it is worth examining in some detail the manner in which they took place. Specifically, the summary judgment record, including Andrews's deposition testimony, reflects that different employees were present during the different clothes-changing incidents, and that Elias changed clothes in front of both male and female employees. Elias also consistently offered the explanation that he did not want to change in the restroom because it was too dirty, a reason unrelated to gender. See Andrews Dep. 34. Andrews admitted that Elias was not naked at any point during the clothes-changing, but would strip down to his boxer shorts. ECF No. 21, Ex. B, Andrews Statement at 2 (referring to Elias stripping down to his "boxers"); ECF No. 21, Ex. C, Wright Aff. ¶ 4 (describing Elias changing down to his "boxer shorts"). There is no evidence that Elias made any comments, statements, or gestures—of a sexual nature or otherwise—at any time while changing, nor did he walk around in a state of undress. See Andrews Dep. 39-40. Additionally, Andrews testified that Elias changed clothes relatively quickly. Andrews Dep. 34, 39, 40 (responding to questions about how

long Elias was undressed before he put his Staples uniform on, Andrews stating "However long it takes somebody to put their clothes on.").

After the October 1, 2009 clothes-changing incident and Andrews's report to Human Resources, Tracey Williams from the Staples's Human Resources Department spoke with Andrews directly. After investigating, Williams advised store management to issue Elias a written counseling concerning changing in the break room, which was done. ECF No. 18, Ex. 2, Dean Aff. ¶ 5; id. at Ex. 3, Williams Aff. ¶¶ 13-15. After that counseling was issued, there were no further incidents of Elias changing clothes in the break room or elsewhere where Andrews could observe him. Andrews also acknowledged that management made some attempts to keep her and Elias apart in October and November 2009, by arranging their schedules so that they did not overlap. Andrews Dep. 76. Sometimes, however, he would come in early anyway, and she would see him. Id.

At her deposition, Andrews testified that her allegations of sexual harassment were "exclusively related to his undressing and changing clothes in front of [her.]" Andrews Dep. 51. She mentioned additional behavior by Elias that bothered her, however, and apparently now contends that her hostile work environment claim includes this additional behavior. Specifically, both Andrews and Wright have provided affidavits in conjunction with the summary judgment motion that describe Elias coming up behind only female employees and screaming suddenly in an attempt to frighten them. ECF No. 21, Ex. C, Wright Aff. ¶ 13; see also Andrews Dep. 44-45. In their statements, both women aver that Elias did not do this to men.[5] Andrews admitted, however, that Elias engaged in similar immature, teasing-type behavior with male employees, as

---

[5] As pointed out by Defendant in its reply, Andrews testified at her deposition that she was unaware of whether he also attempted to frighten any other employees, male or female, testifying " I don't know if he did it with other people. I was in the back most of the time." Andrews Dep. 45; ECF No. 22 at 2 (Staples's reply brief referencing testimony).

well. For example, Andrews testified that Elias once hid a male co-worker's chair in the ceiling of the break room. Andrews Dep. 45-47. Other behavior by Elias directed at Andrews, which she construed as taunting, included him saying to her "I miss you so much" when he came to the store on a day he was off from work, grinning or staring at her at other times, and laughing when she asked, "Do you have a problem?" Andrews Dep. 49-50, 92-93.

Finally, both Andrews and Wright testified that some of the men in the workplace (including Elias) used foul, coarse language and swear words frequently and that many of the women in the workplace were offended by it. ECF No. 21, Ex. C, Wright Aff. ¶ 15; id., Ex. D, Andrews Aff. ¶ 9. Although Andrews does not aver that she complained to anyone in management about the use of such language, Wright testified that she told Dean "that Ann Andrews and other women had said they were offended by [the frequent use of foul and offensive language by Elias and some other male employees] and that management should put a stop to it, but that management did nothing." ECF No. 21, Ex. C, Wright Aff. ¶ 15.

## C. Allegations of Religious Harassment

Andrews also asserts a hostile work environment claim based on her religion. She explains that her co-workers knew she was a Christian because she would sometimes listen to a Christian radio station at work, she read her Bible during breaks or lunch, and she would pray before she ate. Andrews Dep. 53-54. In her deposition, Plaintiff testified that the only incidents supporting her religious discrimination claim involved: (1) an incident on December 16, 2009 in which someone cut the cord to her radio (on which she sometimes listened to Christian music); and (2) an incident on December 21, 2009, in which someone tore a page out of her Bible and taped it to her desk, and then stole the Bible. Andrews Dep. 54-55, 59. Andrews suspects that it was Elias who committed both acts, but she was unable to prove it.

The December 16, 2009 incident involved her radio, but also other property of hers. On that date, Andrews reported for work and discovered that "someone had cut up all the pictures of [her] husband and three year-old daughter that [she] kept on [her] desk in the warehouse. The pieces were strewn across the desk. The person(s) had also cut the power cords to my radio/CD player, heater, and desk fan." ECF No. 21, Ex. B., Andrews Statement at 4. Andrews was extremely upset and "cried [her] eyes out." Id. She immediately reported the incident to Assistant Manager Dean and when she asked if Jacob had come in the night before, Dean "admitted that Jacob had come in off the clock to help a customer." She told Dean she would have to take the day off and left. She also reported the incident to "Tina" in Staples' Human Resources department that morning. She eventually spoke with Williams, who told her the Company was still investigating the incident. Id. Andrews testified at her deposition that whoever committed the act of cutting up her family's pictures was singling her out to scare, intimidate, and terrorize her. Andrews Dep. 82-83. She said that she took the conduct to be directed at her specifically, and not because she was a female or a Christian. Id. at 83.

On December 21, 2009, Andrews reported to work and found that somebody had ripped a page from her Bible and taped it to her desk. Additionally, her Bible was gone and apparently has not been recovered. ECF No. 21, Ex. B, Andrews Statement at 5. She again reported the incident to Dean, who "tried to calm [her] down" because she "was shaking and crying so bad." Id. She told him she had to leave and go to the doctor, to which Dean apparently responded that he "was sorry and that he would hate to work at a store where he was being harassed." Id. She also reported the incident to Staples's Human Resources hotline again. Id. Andrews testified at her deposition that she never learned the results of any investigation that Staples conducted, but seems convinced that it was Elias who committed the acts, pointing out that he was "the only

employee with a motive" and that he "had the opportunity," as he was in the store during the time each of the incidents occurred. Id. at 4.

Plaintiff also testified that Elias once said to her, "you shouldn't be listening to that stuff here," in reference to the Christian radio station she was listening to, but that she "ignored" him and complained to no one about this comment. Id. at 53-54. Andrews testified that, with the exception of that one remark by Elias, no remarks were ever made to her by any Staples employee about her religion, about her reading her Bible at work, or about her listening to Christian music at work. Id. at 58-59.

In her statements submitted with her summary judgment opposition, she also references additional incidents that involved the destruction of her property, and she now claims one of them also is part of her religious harassment claim.[6] ECF No. 21, Ex. D, Andrews Aff. ¶ 5. Specifically, at some point in August, her Bible was missing from her desk. With Wright's assistance, she was able to find the Bible in a red plastic tote "in an obscure location high on top of a cage in the warehouse." She stated that she was very upset and "cried when it was missing." Id. ¶ 6. Again, she alleges that she complained to Howard, who she states was "not sympathetic and did nothing." Id. ¶ 7; see also ECF No. 21, Ex. D, Wright Aff. ¶ 9.

### D. Change in Work Schedule and Alleged Retaliation

In early 2009, before Elias was even hired, Andrews requested to change from a full-time position to a part-time schedule, in order to spend more time with her daughter, which Howard approved. Andrews Dep. 27-29. At some point in mid- or late October (after Andrews had

---

[6] The other incident, which she does claim was harassment based on her religion or gender, occurred around the end of July or early August. She returned to her desk after being away for about a half-hour working and someone had dumped shredded paper on her desk and floor and also on the wall clock. She complained to "Dean . . . or Howard," but according to Andrews, "[n]othing was done." ECF No. 21, Ex. D, Andrews Aff. ¶¶ 3-4; see also ECF No. 21, Ex. C, Wright Aff. ¶ 8 (referencing same incident).

repeatedly complained about Elias), Andrews told Howard that her doctor recommended that she

not work at the copy center or at the cash register and produced a note to that effect.[7] In

response, Howard reduced her work to 15 hours per week from her more typical 25. He

explained she would have to leave work at 11:00 a.m. instead of her usual departure time of 1

p.m.[8] The first week of her reduced schedule was approximately October 30, 2009. He told her

that if she could not run a cash register, he would need to end her morning shift at 11:00 am

because, after that time, the store would be busy and "everyone should be ready to come up and

help out." Andrews Dep. 60, 83-84, 86-88. Andrews acknowledged in her deposition, moreover,

that "everyone" was required to work on the cash registers and provide backup assistance in that

area, when necessary to provide assistance for customers. Andrews Dep. 70. Indeed, when she

was asked why she believed that her hours were reduced from 25 to 15 hours, she testified that it

was "[b]ecause [she] couldn't work the register or copy center." Andrews Dep. 80, 83.

Additionally, Andrews did not recall telling Human Resources that her hours had been reduced

or that she believed the reduction was retaliatory. Andrews Dep. 102.

### E. Andrews's Disability Leave and Separation from Employment at Staples

Andrews sought medical treatment for stress and anxiety she was experiencing as a result

of the alleged harassment on several occasions, including in early July and in October. On

December 22, 2009, she saw Dr. David Keilman at Lewis Gale Clinic for "acute stressors and

anxiety." His notes from that visit include references to harassment at work. He continued her on

---

[7] Apparently, no such doctor's note appears in Staples's employment file for Andrews and one has not been produced in discovery. Nonetheless, Andrews was "pretty sure" that she obtained such a note and gave it to store management in early October. Andrews Dep. 67.

[8] In her opposition to Defendant's summary judgment, Plaintiff takes issue with the schedule change, not just as retaliation, but also—seemingly—as some type of failure to accommodate her medical condition. ECF No. 21 at 8 ("No accommodation was ever offered to her for this medical condition."). The complaint in this case does not assert any claim based on a disability or failure to accommodate her disability, so the Court considers her reduction in hours solely as the basis for a retaliation claim.

Prozac and prescribed the anxiety medication, Xanax. ECF No. 21 at 10-11; id. at Ex. B at 5-6. On December 24, 2009, Andrews requested disability leave as a result of her depression and anxiety, which she took through March 15, 2010. ECF No. 21, Ex. B at 6. While out on disability leave, Andrews received psychological counseling and was diagnosed as suffering from post-traumatic stress disorder ("PTSD") as a result of workplace harassment. Id. at 5-6.

On or about March 16, 2010, Andrews returned to work and a couple of weeks later Elias came into the store and approached her while she was talking with a co-worker. He told her he was planning to work at a hospital or other medical facility that summer and then turned to Andrews and asked, "Hey Ann, do you want to donate some body parts?" Id. at 6. This upset her and she reported it to Assistant Manager Pilcher, but she alleges nothing was done. Id. Andrews does not report any further incidents of harassment after that time. It appears that Elias voluntarily left his employment at Staples in approximately April 2010 and has not worked for Staples since. See Andrews Dep. 111.

Andrews, however, continued to work at Staples for more than a year after Elias quit and now claims she was "constructively discharged due to emotional injuries" on June 21, 2011. ECF No. 21 at 11. She testified that she continued to suffer from the ill effects of the prior harassment and that her psychologist advised that working at Staples was doing her harm and that she should no longer work there. She explained in her deposition that, although Elias was no longer working there, he would continue to frequent the store. She "never knew when he would walk in" and "it terrified [her]." Andrews Dep. 113. Staples claims that Andrews voluntarily resigned and denies that the situation there created a sufficiently severe situation so as to constitute constructive discharge. It describes her resignation for fear of seeing Elias, who quit his job more than a year

earlier, an "extreme, subjective reaction". ECF No. 18 at 20 n.4.[9]

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when a rational trier of fact, considering the evidence in the record as a whole, could find in favor of the non-moving party. Ricci v. DeStefano, 557 U.S. 557, 586 (2009). "Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, 'no material facts are disputed and the moving party is entitled to judgment as a matter of law.'" Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (quoting Ausherman v. Bank of Am. Corp., 352 F.3d 896, 899 (4th Cir. 2003)). Put differently, summary judgment should be entered if the Court finds, after a review of the record as a whole, that no reasonable jury could return a verdict for the non-moving party. See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 958-59 (4th Cir. 1996).

Moreover, a party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citations omitted). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-48. Instead, the non-moving party must produce "significantly probative evidence" from which a

---

[9] According to Staples, Andrews further testified that she has not sought work anywhere else since leaving Staples because she has remained fearful that Elias would appear at her new workplace at any moment. ECF No. 18 at 15 (citing Andrews Dep. 117). The Court is unable to verify this assertion because page 117 of Andrews's deposition was not attached as an exhibit to Defendant's motion.

reasonable jury could return a verdict in his favor. Abcor Corp. v. AM Int'l, Inc., 916 F.3d 924 (4th Cir. 1990). Thus, "[t]he summary judgment inquiry . . . scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir. 1993). "While courts must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue, summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." Evans, 80 F.3d at 958-59.

### B. Hostile Work Environment/Harassment Claims

As noted, Andrews has brought claims of a hostile work environment based on both her sex and her religion. Both claims are governed by the same legal standards. To succeed on either her sexual harassment or religious harassment claim, Andrews must demonstrate that a reasonable jury could find the harassment: (1) unwelcome; (2) based on her gender (or religion); (3) "sufficiently severe or pervasive to alter the conditions of plaintiff's employment and to create an abusive work environment;" and (4) that there is some basis for imputing liability to plaintiff's employer. Mosby–Grant v. City of Hagerstown, 630 F.3d 326, 334 (4th Cir. 2010) (quoting EEOC v. Central Wholesalers, Inc., 573 F.3d 167, 175 (4th Cir. 2009)). An affirmative defense is available to employers that "can demonstrate, by a preponderance of the evidence, that (1) [they] 'exercised reasonable care to prevent and correct promptly any harassing behavior'; and (2) the plaintiff 'unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" Id. at 186 (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998)).

### 1. Hostile Work Environment Based on Sex

The Court turns first to Andrews's claim of a hostile work environment based on her sex. As to this claim, the Court need not determine whether there is a basis for imputing liability to Staples as required by the fourth element, nor whether Staples has established its affirmative defense by taking prompt, corrective, and effective action after Plaintiff complained,[10] because the Court concludes that Plaintiff has failed to demonstrate the second and third elements of her claim.

Turning first to the third element, Andrews has failed to show that the offending conduct was "sufficiently severe or pervasive to alter the conditions of plaintiff's employment and to create an abusive work environment." Mosby–Grant, 630 F.3d at 334. Even if accepted as true in their entirety (including the allegations in her affidavit and statement to the EEOC), Plaintiff's allegations of harassment do not meet Title VII's demanding standard for a hostile work environment. While the Court in no way condones the alleged treatment of the Plaintiff, and

---

[10] Staples contends that there is no basis for imputing liability to it, because it acted promptly to end the harassment once Andrews reported it. Andrews strenuously disputes that, and points to her repeated complaints about Elias to store-level management beginning in April and continuing in June and July each time that Elias changed into his uniform in the break room. It is clear that some steps were taken to remedy the clothes-changing incidents at some point, even if they were not completely effective in stopping Plaintiff from seeing Elias changing clothes. For example, although Andrews has testified that there was no response from management after the first incident, at some point after the June and July incidents, store management provided Elias somewhere else to change, and there were no more incidents in the break room for months. Plaintiff testified, however, that she still accidentally observed Elias in a state of undress on several occasions through a window in the alternative room's door. Then, after the alternative place Elias had been given became unavailable (due to the man he was changing in front of objecting), he once again changed in the break room. But, after the October 1, 2009 incident and Andrews's report to Staples's Human Resources department, Elias was given a written counseling, and no additional incidents involving him changing clothes occurred. This may have been sufficient to relieve Staples of responsibility, although the Court need not reach that issue here. Cf. Xerxes Corp., 639 F.3d at 674 ("Plaintiffs often feel that their employer could have done more to remedy the adverse effects of the employee's conduct. But Title VII requires only that the employer take steps reasonably likely to stop the harassment.").

while much of Elias's behavior was inappropriate and immature, "there is a line between what can justifiably be called sexual harassment and what is merely crude behavior." Ziskie v. Mineta, 547 F.3d 220, 228 (4th Cir. 2008). Indeed, Title VII is not a "general civility code" because if that were the case "we would be litigating past sundown in ever so many circumstances." Id.

Significantly, while there is ample evidence that Elias's conduct was subjectively upsetting to Andrews, to be actionable, the conduct must also have been objectively unreasonable.[11] The Fourth Circuit has stated that to determine whether a reasonable person would find a work environment hostile, courts look "at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Singleton v. Dep't of Corr. Educ., 115 F. App'x 119, 122 (4th Cir. 2004) (unpublished) (quoting Faragher v. Boca Raton, 524 U.S. 775, 787-88 (1998)). Another factor to be considered is the relative power between the harasser and the victim. Ziskie, 547 F.3d at 227-28.

Here, the conduct alleged by Andrews includes Elias, a male co-worker, changing in the break room on approximately seven occasions. Most of these instances occurred over a period of weeks, but then there was a break of several months before the final incident on October 1, 2009,

---

[11] Plaintiff mistakenly relies on Wright's affidavit as proof that the conduct was objectively unreasonable, and specifically on her testimony that "In my opinion and based on my experience as a Human Resources Supervisor at Sears [for one year], the average woman would be offended by Elias changing his clothes and pants in a location, like the break room, where other employees could see him . . ." ECF No. 21, Ex. C, Wright Aff. ¶ 11; see also id. (Elias's conduct "is clearly offensive to most women, and it was obviously offensive to Andrews as a woman"). Andrews's reliance on this testimony is misplaced for at least two reasons. First, the determination of whether conduct is sufficiently severe and pervasive to create an objectively hostile or abusive work environment requires the Court to consider various factors, as discussed herein. Cf. Hopkins v. Baltimore Gas and Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996). Thus, Wright's personal opinion about whether one incident might be offensive to most women is not dispositive. Second—and tellingly—nowhere in Wright's affidavit does she say that the clothes-changing in fact offended her or any other woman other than Andrews. See generally id.

and after that, there were no more clothes-changing incidents. Elias also would come up behind her and scream to frighten her, and this conduct occurred about once a week during the months she saw him. He also would sometimes stare and grin at her. Andrews also felt harassed by the men in the store (including Elias) using coarse and crude language, although she admitted that she never complained about this conduct to anyone. She also points to the incidents of property tampering as "harassment," but plainly stated in her deposition that she did not consider those to be harassment based on her gender.

Although Andrews testified that she felt physically threatened by Elias's conduct, her descriptions of his conduct (grinning, staring, saying "I miss you so much," and even the clothes-changing) do not involve objectively "threatening" conduct, physical or otherwise. Significantly, moreover, there was no physical contact at any time between Elias and Andrews, he never made any sexual comments toward her, and he never exposed his genitalia to her. Andrews Dep. 51-52.

Moreover, these occasional incidents spread over a period of months are not sufficient to create a work place that is "permeated with discriminatory intimidation, ridicule and insult." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). Rather, they are examples of "crude behavior," "boorishness," and the "occasional off-color joke or comment" that the Fourth Circuit has found insufficient to give rise to a Title VII claim of a hostile work environment. Ziskie, 547 F.3d at 228. Moreover, the relative "power" between Elias and Andrews does not contribute to making the conduct more severe. See id. at 227-28 (explaining this factor). Elias was a co-worker, not a supervisor, he was younger than Andrews by about fifteen years,[12] they worked in different departments, and Andrews was a long-term

---

[12] Andrews Dep. 53 (describing herself as 38 years old); ECF No. 21, Ex. B at 2 (Andrews estimating Jacob was in his late teens or early 20s).

employee at the company, while Elias had only been employed there for a few months when the clothes-changing incidents began happening.

The only factor that supports a finding of severe and pervasive conduct is that the conduct at issue here did in fact interfere with Andrews's performance of her duties, because it was so upsetting to her. The Court hastens to note that it does not doubt the severity or genuineness of Andrews's reaction to Mr. Elias's conduct, or to the incidents involving the destruction of her personal property. Indeed, she has produced ample evidence that these incidents were genuinely upsetting to her.[13] But not every workplace aggravation gives rise to an actionable legal claim. See EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 316 (4th Cir. 2008) ("Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life."). Instead, the objective prong of the test is "designed to disfavor claims based on an individual's hyper-sensitivity." EEOC v. Fairbrook Med. Clinic, P.A., 609 F.3d 320, 328 (4th Cir. 2010). The Court thus concludes, based on all the relevant factors, that there is not enough evidence from which a jury could find the conduct at issue to be sufficiently severe and pervasive to be actionable.

Second, Plaintiff has failed to produce sufficient evidence showing show that the alleged harassment was because of her gender and "harassment due to personality conflicts will not suffice." Ziskie, 547 F.3d at 226. As explained by another district court,

> there are at least three possible evidentiary avenues open to a plaintiff to demonstrate that the alleged harasser's conduct was "because of sex." First, the plaintiff may show that the alleged harasser's behavior constituted an earnest sexual

---

[13] Defendant references in general terms a prior history of sexual abuse suffered by Plaintiff. See ECF No. 18 at 15 & n.2. An individual with such a history might well experience the incidents at issue here differently than a person without such a history.

> solicitation. Second, the plaintiff may demonstrate that the harasser
> displayed a general hostility to [females] in the workplace. Third,
> under certain circumstances a plaintiff may offer direct
> comparative evidence about the harasser's treatment of men and
> women.

English v. Pohanka of Chantilly, Inc., 190 F. Supp. 2d 833, 843 (E.D. Va. 2002) (internal

citations, parentheticals and footnote omitted).[14] See also Sunbelt Rentals, Inc., 521 F.3d 306

(4th Cir. 2008) ("complaints premised on nothing more than rude treatment by coworkers,

callous behavior by one's superiors, or a routine difference of opinion and personality conflict

with one's supervisor are not actionable under Title VII") (internal citations and quotation marks

omitted).

In this case, Plaintiff has not offered sufficient proof to send her case to a jury under any

of these three evidentiary issues. First, there is no evidence at all that anything Elias did

constituted an earnest sexual solicitation and nothing about the manner in which he changed

clothes was sexual or vulgar. Moreover, Elias made no comments to her regarding sex or

regarding her gender, nor any comments at all to her of a sexual nature or about her gender.

Second, the Court concludes there is insufficient evidence that Elias (or others at Staples)

displayed a general hostility toward women in the workplace. Although Andrews complains now

that there were men using coarse or crude language in the workplace, she never complained

about that behavior to anyone in management while employed nor did she offer any specific

examples that indicate the crude language was directed toward women or involved comments

about women, either generally or about her in particular. As another court faced with similar

facts reasoned, "Although [the] testimony establishes that the offensive language was pervasive,

---

[14] Although the English court and most of the cases cited in the foregoing quotation were dealing with same-sex harassment, the summary of methods for proving harassment was "because of sex" are not limited only to same-sex harassment cases.

it also shows that the language was generalized swearing, not directed verbal attacks based on sex or religion; plaintiff has not submitted an affidavit nor any other evidence suggesting that the profane language was directed at her because she was a woman, or because she was a Christian. Therefore, plaintiff's claim . . . fails to overcome sworn testimony in the record establishing that the offensive language at issue was merely the general use of profanity that plaintiff found offensive." Williams v. Harvey, 2006 WL 2456406, at *7 (E.D. Va. Aug. 21, 2006); id. (testimony stating "a lot of cussing was happening" was insufficient to establish a hostile work environment); Hopkins v. Baltimore Gas and Elec. Co., 77 F.3d 745, 754 (4th Cir. 1996) ("Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace."); see also Lucas v. South Nassau Communities Hosp., 54 F. Supp. 2d 141, 148 (E.D.N.Y. 1998) ("The expletives and comments uttered by the parties, which might be considered crude and vulgar when falling on vestal ears, are unfortunately all too commonplace in most current vocations."). There is simply nothing in the record to support a showing of a general hostility toward women in the workplace, by Elias or by anyone else at Staples.

Finally, Plaintiff has not shown that Elias engaged in the alleged harassment only with women and not with men. Although there was some evidence that Elias snuck up behind women—and not men—and screamed to frighten them, Andrews also testified that Elias engaged in similar types of immature behavior or pranks, such as hiding a male co-worker's chair. Similarly, Elias apparently was not particular about the gender of people he changed in front of, as the undisputed evidence shows that he changed in front of both men and women co-workers. See, e.g., Lack v. Wal-Mart Stores, Inc., 240 F.3d 255, 262 (4th Cir. 2001) (employee failed to show harassment because of sex where supervisor was "indiscriminately vulgar and offensive" and "obnoxious to men and women alike"). Douglas v. Lancaster Comm. College,

990 F. Supp. 447, 463 (W.D. Va. 1997) (employer was entitled to summary judgment on hostile-environment claim arising out of on allegations that plaintiff saw supervisor "half-naked (changing his clothes) in his office," where he "smirked and laughed during grievance hearings involving the plaintiff," and where another supervisor called her a "bitch," because there was insufficient evidence that the conduct was based on sex; there was "nothing overtly sexual about the events," and no evidence that events took place "because the plaintiff was a woman."). Likewise, the later conduct involving the destruction of Plaintiff's property, even assuming it was done by Elias, does not reflect or show a bias against women but instead, a personal grudge or bias against Plaintiff. Indeed, even Andrews admitted that someone cut her family pictures not because she was a female or a Christian, but simply to "intimidate and terrorize" her. Andrews Dep. 82-83.

In short, the Court concludes that there is simply insufficient evidence from which a jury could conclude that the alleged incidents here were because of Plaintiff's sex. Gilliam v. South Carolina Dept. of Juvenile Justice, 474 F.3d 134, 142 (4th Cir. 2007) (finding plaintiff failed to prove harassment was based on [gender] because she offered no direct evidence that conduct was motivated by [gender] animosity and "conclusory statements, without specific evidentiary support, cannot support an actionable claim for harassment" (quoting Causey v. Baloq, 162 F.3d 795, 801 (4th Cir. 1988)). Andrews's hostile work environment claim based on sex thus fails as a matter of law, and the Court grants Defendant's summary judgment motion as to this claim.

**2. Hostile Work Environment Based on Religion**

In her deposition, Andrews was very clear about the allegations that she was relying on to support her claim of religious harassment:

> Q. So what incidents do you claim exhibit religious discrimination?

21

A. In December [2009] . . . I came in, and somebody had ripped a page out of my Bible and taped it to my desk and cut the cord on my radio, cut the cord on my – well, do you want the rest, everything they did?

Q. I want all the –

A. Just for religious

Q. – relevant facts with respect to –

A. Religious discrimination.

Q. Yes.

A. Then that is it.

Q. That they tore a page out of your Bible, cut the cord to your radio, and was there anything else?

A. No.

Andrews Dep. 54-55. Later, she was asked, "have you told me everything about your religious discrimination and [sic] claim?" and she responded, "Yes." Andrews Dep. 59. She also testified in her deposition that Elias once made a remark to her that she should not be listening to Christian music in the store. According to her, she ignored this remark and did not report it to anyone in management; she also did not include that in her list of allegations of religious discrimination. As previously noted, however, she did not mention at any time in her deposition an earlier incident in which her Bible was hidden. It was not until she filed her affidavit in opposition to summary judgment that she referenced the August 2009 incident in which her Bible was taken from her desk and hidden in the warehouse, but ultimately recovered.

Because Andrews may not contradict her own clear and unequivocal sworn testimony, the Court will not consider the earlier alleged incident in which her Bible was hidden. See supra at n.3 (citing Barwick, 736 F.2d at 960). Instead, the Court is left with a claim of a hostile work environment based on religion premised only on: (1) the December 16, 2001 in which pictures of her family were cut up and left on her desk, and cords were cut to her electronic equipment,

including her radio;[15] and (2) the December 21, 2001 in which her Bible was desecrated and stolen.

Staples argues that these two isolated incidents are insufficient to give rise to a hostile work environment claim because they are not sufficiently severe or pervasive, and that may well be accurate. See, e.g., Whatley v. S.C. Dep't of Pub. Safety, 2006 WL 3918239, at *7-8 (D.S.C. Sept. 1, 2006) (unpublished) (removal of a Bible and religious research books from plaintiff's desk and supervisors' threats to discipline him if he discussed faith-related matters while at work, in addition to various emails and comments to him to discontinue discussing his religion and several comments he overheard calling him a religious fanatic were not sufficiently severe and pervasive to establish a hostile work environment). But the Court need not resolve whether Plaintiff can establish the conduct was "severe or pervasive," because it concludes that Staples's second argument is persuasive. That is, even if Andrews can establish sufficiently severe or pervasive harassment based on religion, Staples is entitled to summary judgment because there is no basis for imputing liability to Staples.

In the case of harassment by employees, as opposed to management, "employers are liable only for their own negligence in failing, after actual or constructive knowledge, to take prompt and adequate action to stop [the harassment]." Mikels v. City of Durham, 183 F.3d 323, 332 (4th Cir. 1999). Furthermore, where an employer's response to reported harassment is

---

[15] As to the December 16, 2001 cutting of the cord to her radio, it is questionable whether this was an act of religious discrimination. Significantly, this was the same incident in which someone also cut her heater and fan cords and cut up pictures of her family. It is difficult for the Court to separate out the radio cord being cut as a separate act of religious discrimination that is somehow distinct from the destruction of her other belongings. It appears more likely that whoever committed these acts did so, as Andrews admitted for purposes of everything except the radio, to intimidate or scare her. Cf. Andrews Dep. 82-83. In any event, for purposes of ruling on the summary judgment motion, the Court will presume that the act of cutting her radio cord was based on her religion.

handled in accordance with the company's established policy and includes conducting an investigation and taking action to address the findings in a prompt manner, such conduct is "reasonably calculated to end the harassment and, therefore, reasonable as a matter of law." EEOC v. Xerxes Corp., 639 F.3d 658, 671 (4th Cir. 2011). This is true even if the harassment subsequently reoccurs. Id.

Plaintiff has failed to refute Staples' evidence that its investigation of Plaintiff's complaints about the damage to her property was prompt and sufficient as a matter of law. First, Staples' has a policy prohibiting religious harassment and a procedure in place for reporting such harassment. ECF No. 18 at Ex. 3, Williams Aff. ¶¶ 7-8 and Ex. B thereto at 9, 11-12. Its written handbook also precludes tampering with or destruction of another associate's personal property. Id. at Ex. B at 32. After Plaintiff complained about these two incidents, it is undisputed that Tracey Williams of Staples' Human Resources Department conducted an investigation. While there was no written report produced of that investigation, Williams avers that she interviewed store managers and employees, reviewed store schedules, and verified that there were no cameras in the area in question. ECF No. 18 at Ex. 3, Williams Aff. ¶ 16. Andrews has offered nothing to dispute that this investigation was done, other than the absence of a written report. Although Andrews suspected Elias was the perpetrator, Williams was unable to determine "who was responsible" or 'to "substantiate Andrews' suspicion that Elias was responsible." Id.; see also ECF No. 18, Ex. 2, Dean Aff. ¶ 9 (explaining that he was not able to determine who was responsible for the incident in which a page from Plaintiff's Bible had been removed and the rest of the book was missing). Moreover, it is undisputed that, after the December 21, 2009 incident, there were no additional incidents of any religious harassment or any additional incidents involving the destruction of Plaintiff's property. Based on this prompt, remedial action by

Staples, the Court concludes that the liability cannot be imputed to it for these acts. Xerxes Corp., 639 F.3d at 674 ("Title VII requires only that the employer take steps reasonably likely to stop the harassment."). Accordingly, the Court grants Defendant's summary judgment motion as to Plaintiff's religious harassment claim.

## C. Retaliation Claim

To prove a *prima facie* case for retaliation, an employee must show that: (1) she engaged in a protected activity; (2) the employer took adverse employment action against the employee; and (3) a sufficient causal connection exists between the protected activity and the adverse employment action. Lettieri v. Equant, Inc., 478 F.3d 640, 649-50 & n. 2 (4th Cir. 2007); Bryant v. Aiken Regional Medical Centers, Inc., 333 F.3d 536, 543 (4th Cir. 2003). "If the plaintiff establishes [a] prima facie case, the burden shifts to the employer . . . 'to articulate a legitimate, nondiscriminatory reason for the adverse employment action.'" Lettieri, 478 F.3d at 646 (quoting Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc)); see also id. at 651 (applying the pretext analysis to retaliation claim). Next, "the burden returns to the plaintiff to show that 'the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination.'" Id. at 646 (quoting Hill, 354 F.3d at 285). In a recent decision, the Supreme Court has emphasized that a Title VII retaliation claim requires that the complaint be the but-for cause of the retaliatory action. Univ. of Tx. Sw. Med. Ctr. v. Nassar, __ S. Ct. __, 2013 WL 3155234, at *16 (June 24, 2013). That is, a Title VII retaliation plaintiff must establish that "her protected activity was a but-for cause of the alleged adverse action by the employer," and not merely a "motivating factor." See id.

Once a defendant has met its burden of production and articulated a legitimate nondiscriminatory reason for an adverse employment action, "the McDonnell Douglas frame-

work—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination vel non." Reeves, 530 U.S. at 142 (internal quotation marks and citations omitted). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [or retaliated] against the plaintiff remains at all times with the plaintiff." Tx. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). Once the defendant produces a nondiscriminatory explanation, the plaintiff is afforded the opportunity to prove by a preponderance of the evidence that defendant's explanation is merely a pretext for discrimination "by showing that the employer's proffered explanation is unworthy of credence." Reeves, 530 U.S. at 143 (quoting Burdine, 450 U.S. at 256). "The ultimate question is whether the employer intentionally [retaliated], and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.'" Reeves, 530 U.S. at 146-47 (quoting St. Mary's, 509 U.S. at 524). "It is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation" of retaliation. St. Mary's, 509 U.S. at 519.

As discussed, Andrews alleges that, as a result of her complaints about Elias changing in the break room, Staples retaliated against her by reducing her hours from approximately 25 hours per week to 15 hours per week, for the period between October 30, 2009 and December 22, 2009.[16] At the summary judgment hearing, Andrews's counsel described her allegation as essentially being that she told Staples she could not work in certain areas because she needed to avoid Elias, and management responded by cutting her hours.

Staples argues that Andrews cannot establish a prima facie case because she cannot show a causal link between her complaints and her schedule. Although Andrews testified that it was

---

[16] Andrews testified that she worked her approximately 25 hours weekly before October 30, and after her return from her disability leave in March 2010 until she separated from employment.

"possible" that her complaints about Elias resulted in her reduced hours, Andrews Dep. 105, she has not presented any other evidence other than her own speculation. Moreover, Staples has successfully articulated a "legitimate, nondiscriminatory reason for the adverse employment action"–that Andrews could not work during the busiest period because her doctor told her she could not work in the copy center or at the check-out area.[17] It points to Andrews's own testimony that she told her managers she could not work in certain areas, and her concession that providing backup in those areas was required of "everyone" as part of their duties. Andrews Dep. 70. She was told when she stated she could not work in those areas that her hours would have to be cut because the 11 am – 1 pm time frame that used to be part of her schedule was a busy time that required everyone to be available to work in the cashier area and copy center area.

There is simply insufficient evidence that this explanation was a mere pretext for retaliation. First, the fact that Andrews had repeatedly complained about Elias's clothes-changing incidents months earlier (in June and July) and her hours were not cut at that point undermines any argument of pretext. Instead, her hours were not cut until she told the store she was unable to perform duties expected of all employees during the store's busy hours. Notably, moreover, Andrews does not point to any other employee who refused to work in those areas and who was permitted to still work during those hours.

Andrews points to her testimony that there are other areas she could have worked instead and that her primary job did not include working in those areas. Staples might have been better served (and indeed, avoided a retaliation claim altogether) had it permitted Andrews to continue

---

[17] Staples makes repeated references to the fact that the actual doctor's note is not in the record. For purposes of summary judgment, however, the Court views the evidence in the light most favorable to Andrews, the non-movant. See Henry, 652 F.3d at 531. She has testified that she is "pretty sure" she provided a doctor's note and has repeatedly referenced that it was a medical requirement that she not work in those areas. Thus, a jury could so find.

to work her full schedule and to work in those other areas. But its policy is not so ridiculous as to be evidently pretextual and the Court's view of the wisdom of this particular decision is irrelevant, so long as the decision was not made to retaliate against Andrews for her complaint about Elias. Cf. DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998) ("[T]his Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination . . . . It is not our province to determine whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the" adverse action) (internal quotation marks and citations omitted). Here, Andrews admitted that "everyone" had to work in those areas, and thus the fact that Staples could have allowed her to work elsewhere does not mean that refusing to allow her to do so was a retaliatory action. In short, there is not sufficient evidence from which a jury could conclude that the reason her hours were cut was because she complained, or that Staples' given reason is a mere pretext for retaliation.

For these reasons, the Court grants defendants' summary judgment motion with respect to Andrews's retaliation claim.

### D. Intentional Infliction of Emotional Distress

Plaintiff's final claim is a claim for intentional infliction of emotional distress. Under Virginia common law, a plaintiff alleging intentional infliction of emotional distress must prove: "the wrongdoer's conduct is intentional or reckless, the conduct is outrageous or intolerable, the alleged wrongful conduct and emotional distress are causally connected, and the distress is severe" Womack v. Eldridge, 215 Va. 338, 342 (Va. 1974). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

community." Id. This tort "is 'not favored' in the law." Russo v. White, 400 S.E.2d 160, 162 (Va. 1991), citing Ruth v. Fletcher, 377 S.E.2d 412, 415 (Va. 1989).

As relevant here, a plaintiff who fails to establish conduct sufficient for a hostile environment claim cannot, as a matter of law, establish a claim for the intentional infliction of emotional distress based on that same conduct. Hartsell v. Duplex, 123 F.3d 766, 774 (4th Cir. 1997). As stated in Dwyer, it is unreasonable for a claim of "outrageousness" to persist once the district court has determined that the conduct was not sufficiently egregious for a claim of "hostile" environment. Dwyer v. Smith, 867 F.2d 184, 194 (4th Cir. 1989). As the Court finds that Staples's conduct did not create a hostile work environment, based on either sex or religion, the Court also finds that the Andrews's claim for intentional infliction of emotional distress fails as a matter of law. Cf. id. The conduct alleged here simply does not rise to the level of outrageousness required to sustain such a claim.

## III. CONCLUSION

For the stated reasons, defendants' summary judgment motion (Dkt. No. 16) is **GRANTED** in its entirety. The Clerk is directed to send copies of this memorandum opinion and accompanying order to all counsel of record.

**ENTER:** This 14 day of July, 2013.

James C. Turk
Senior United States District Judge